245418 Jeffrey Bilyeu et al. versus UT-Battelle LLC. Arguments not to exceed 15 minutes per side. Mr. Field for appellants. Good morning, Your Honors. Good morning. On behalf of the appellants, Mr. and Mrs. Bilyeu in this case, and as noted, reserved three minutes rebuttal time. Very well. I'd like to begin with the disparate treatment claim advanced by Mr. Bilyeu first in this case. In this case, district court held incorrectly that he suffered no adverse employment action, concluding at page 6 of the summary judgment decision that unpaid leave was not a materially adverse change in terms or conditions of employment. To reach that conclusion, the district court relied on this court's decision in Tepper to conclude that he was he was simply not paid for time that he had not worked. So at the outset, as we've set forth in the Algrove case, is that right? Yes, sir. Does that come after, not that it matters for our purposes, but that case comes after the district court's decision? That's correct, Your Honor. Okay, so it's been a change in law in your view, or you think a clarification? I would call it a clarification, Your Honor. I think it remains to be seen exactly how courts apply Muldrow. Muldrow has a footnote that calls out several cases, doesn't reference this circuit's decisions, but identifies several cases in several circuits where there will need to be a change to the standard. Courts have applied a significance test or materially adverse standard, but that is the standard that the district court applied. That's how the district court led off the discussion of Mr. Bilyeu's adverse employment action section of the decision. But Muldrow says the only thing that a plaintiff needs to show is some harm, and in that case the district court, I'm sorry, in that case the Supreme Court held that the some harm standard was satisfied with a transfer where there's no change in rank, no change in pay. The employee doesn't need to show that the harm was significant, just worse. Justice Kavanaugh in his concurrence explained that that's a relatively low bar, and he went on to give a list of things that he surmised would likely satisfy that standard. Changes in money, time, satisfaction, career prospects, interest levels, and the like. What relief are you seeking here right now? You want it sent back down, or us to declare something, or what? Yes, Your Honor. I believe, well, we think that the court can reverse and can also indicate that the record satisfies the some harm standard, rather than sending it back down for analysis under that standard. And that goes right to Judge Kethledge's question. And that's the clarification point. We think that the district court was incorrect as shown by Muldrow, but even Muldrow aside, we think that Tepper and Insonia, the cases on which the district court relied, the district court relied, are Sabbaterian cases with intermittent unpaid leave, with occasional days off. That is fundamentally different than putting an individual on continuous indefinite unpaid leave. So we think that Muldrow aside, the district court was wrong. Muldrow underscores . . . So you've got the month's vacation that gets burned up and three days unpaid, right? Yeah, 24 hours unpaid, and he had to use all of his vacation, which amounted to . . . Okay. I mean, well, I mean, okay. I mean, I think we understand your argument on this point. Okay. Then I'd go to the district treatment claim with respect to Mrs. Bilyeu, which . . . Yeah. So, I mean, what's really the harm there? Because it seems like basically what's going on is kind of what we had in some of the military vaccine cases, where there's one regime for religious-based exemptions, and there's another one for administrative leave that was much more liberal with respect to, say, the Air Force officers in one case. And it was a tougher program. Nobody ever got the religious one. Here, I mean, it seems that the conditions . . . I mean, they're granted, not quite equally in percentage, but there's plenty of whatever you call them, exemptions or whatever, administrative, religious, but the religious is unpaid, the administrative is paid, right? So there are several ways where the administrative leave . . . the medical leave. I'm thinking administrative was . . . The medical leave is more favorable, in your view, in a number of ways. I guess the question I have for you is, as it turns out, as you know, she gets the medical leave. So what . . . I mean, I know it's just some harm, but what concrete harm do we really have here? Certainly, Your Honor. So you're correct, as you summarized it, there's . . . except I would probably say that the differences are quite stark between the religious and the medical accommodations in this case, not . . . Right. But she gets the medical. Correct. As an overall point, the processes are quite different, I think, violates Abercrombie, clearly. Now, with respect to Mrs. Bilyeu, it's a little more complicated. On the adverse action, again, the question for this claim is when she was a religious requester, did she suffer any harm? When she was a religious requester, she was effectively treated as being in violation of company policy. She had to clean out her office, turn in her equipment, read out of her security clearance, subject to a lanyard policy on campus where only those who are vaccinated get to wear a lanyard that says vaccinated. She's, in fact, heading to unpaid leave. She leaves the office on October 29th, 2021, headed for unpaid leave on that Friday. Monday was the first day of the unpaid leave period. She happened, in good fortune, to be at the PI hearing where she heard that there's an unannounced medical accommodation for those who are breastfeeding their children. So she puts in a request, gets an 11th hour accommodation for medical reasons. How long was this period between her application, or whatever it is, to have a religious exemption and this . . . and the time when she learns about the medical exemption? What's the time period? Are we talking like a week or two here? A little bit longer than that. The mandate's announced on August 26th. The accommodation request is submitted on September the 7th. The deadline for those requests is September 15th. On the 16th, just the day after, is when UT Battelle announces for the first time that religious accommodation requesters should be prepared to go on unpaid leave until the end of the pandemic. And then it's ultimately October 30th when she gets the 11th hour accommodation. Let me ask you about her involvement, if any, in this process of interviews. Is there anything in the record of her having been interviewed? She was not . . . the record said that she was not interviewed. Only Mr. Bill Liu was interviewed. There were 24 individuals interviewed, and then UT took place. When? Yes. I could . . . it is after . . . it's after . . . I'm sorry that I don't have the specific date. I can get that on rebuttal for you, Your Honor. Presumably before the October 30th hearing. Yes, sir. And sometime after October 26th . . . or August 26th, correct? Correct, yes. Okay. I'm just really interested in this interview, actually. And you don't seem to talk about it enough in your briefing. And in particular, I'm interested in the information sheet that was given. What are the circumstances that are in the record as to what the employer did with this interview sheet? And was it something the employee was required to read? And was it discussed? What is there about this interview sheet? Because it's very . . . it seems pretty disturbing to me, what's in the sheet, the information sheet. I fully agree, Your Honor. And I would direct the court to three places in the record. There's really three documents that work together. So one was the fact sheet, which is at page ID 1119. And then the interview questions, which were at page 2040. And then, to your question, the certification statement, which is at page ID 1121. The second point in the certification says, I have read and understand the provided fact sheet, which describes the use of fetal cell lines in the post-production testing, but not the development or production of the Moderna and Pfizer vaccines that are currently available at ORNL and in the surrounding community. It goes on to say, I'm aware of fetal cell lines that are used in a variety of other products, like . . . a long list, I'll just highlight Tylenol, etc. And then says, with this understanding, I certify that I have not, do not, and will not use any of the products listed above. And then, to make sure it's clear, UT Battelle puts in a line that says, by the way, if you're signing this, don't forget that your employee handbook requires honesty. So you have these three documents. The fact sheet's handed out to the employees. They have to sign a certification stating that they . . . And the fact sheet also includes the statements, purported statements from religious leaders. Yes. What their views are on the vaccine. Yes, Your Honor. At the very bottom of page ID 1119, carrying over onto the next page, it says, religious beliefs, leaders from a variety of faith traditions favor COVID-19 vaccines on the grounds of care for one's neighbor, family, and self. Footnote 10 lists links to a table. If you click on that table, you'll see that that table cites to WebMD as a basis for the statements and the views of religious leaders. Notably, there's nothing in here about any contrary views of other religious leaders. This is given as fact. Religious leaders oppose what you, Mr. Bilyeu, believe. And, in fact, by the way, you've been using all these products that probably also have ties to fetal cell lines. If we were to send the case back for her, what sort of damages would she have? So, I do think that the subsequent 11th hour accommodation for medical reasons would likely limit her damages as compared to Mr. Bilyeu. But the record still indicates that she suffered emotional distress, emotional harms that she talks about in her affidavit filed with the PI papers. And she was part of the, she had the same financial implications, that is not the best way to say it. She suffered financially with Mr. Bilyeu during the time of unpaid leave because we have to keep in mind that throughout this time, UD Patel is telling individuals unpaid leave is going to be very long. This notion that it was a 60-day unpaid leave is a complete fabrication. Everything in the record says it will be long. We've cited some examples of that. Well, I mean, so it seems, I mean, to follow up on Judge Seiler's question, I mean, it seems like as to Mrs. Bilyeu, you're saying her harm is, you know, cleaning out the office, some of that administrative sort of hardship. And then there was this financial, a period of financial uncertainty in which, I mean, you say they sold a car and a boat. I mean, people do these things in the normal course, too. That's not necessarily prima facie evidence of harm. And I mean, those are like follow-on consequences to an action taken by UT Patel allegedly. Do you have any legal support for the proposition that the sorts of putative harms you're pointing toward for Mrs. Bilyeu have been recognized in this context or otherwise as legally cognizable? Because the law can be kind of tough about this stuff. And certain things people just bear. The law doesn't provide a remedy for every sort of insult that someone suffers, even unjustly. Certainly, Your Honor. And I see... Yeah, go ahead. I'm sorry. It was a long question, but... I'm happy to address it, Your Honor. A few points. The 401K withdrawal, I think, is the most significant economic harm that the Bilyeus suffered. And that was due not just to rising house costs. That was due to the financial circumstances of their family. They had also planned to sell their car. The car sale actually closed after Mr. Bilyeu was called back. But recall during that time, there's litigation, as this Court is no doubt aware, about the contractor mandate. The mandate at UT Battelle was only temporarily suspended pending the resolution of that. They had every expectation. They were headed back to unpaid leave. And Mrs. Bilyeu's breastfeeding accommodation was temporary. She was told it's temporary. And then after that, you're headed to unpaid leave. So this Court has not addressed, to the best of my understanding, this type of threatened pay cut, adverse employment action, or harm. We pointed to the McNeil Court out in McNeil decision in the Northern District of Texas, where Judge Kaczmarek addressed this point and said that a realistic, drastic pay cut threat can be an adverse action. And then I would also just point, again, to Justice Kavanaugh's list of things that he would suggest could satisfy the sum harm standard in his case. Which one do you think is most analogous or whatever? There's a wealth of instruction in Justice Kavanaugh's concurrences. There is. I'm sort of joking around. He likes the right concurrence. I think they're very insightful. And in this case, I think that the point of his statement at the very end of his concurrence is that this is more than just money. This is more than just time. This is career prospects. Is there any concrete thing enumerated in his concurrence that you think is analogous in some way? Effects on family obligations. He lists that. Effects on family obligations, he addresses interest level. I think it's fair to say, Mr. and Mrs. Bilyeu, their interest level in their jobs has been really shaken by the way that their employer they have worked for for many years. Okay. All right. Well, you'll have your rebuttal. And we will hear from Mr. Frazer. Good morning. My name is Keith Frazer here on behalf of UT Battelle. And to the extent you may or may not be familiar with UT Battelle, it manages and operates the Oak Ridge National Laboratory, which is one of the premier scientific research facilities in the world. Yeah. I had a sabotage case that came out of there with the hump, you know, the hump that they have there? Yes. And an 82-year-old nun and a couple of Army vets got all the way in there and they got charged with sabotage. But we said they were not guilty as a matter of law. Well, I'm glad I have my badge when I go there. Don't mess around. And so in this case, you know, it centers around the COVID pandemic and how companies were approaching that. And UT Battelle had reached a position where primarily because of the Delta variant, they were concerned that their mission was at risk because of the spread and addressed it. Judge Bush, you asked about the interviews. And the interviews were intended to try to determine a person's sincerity. So it was not a, what's the right accommodation? It's, do you hold a sincere belief? After, I believe it was 24 interviews, they concluded that the question of sincerity was too subjective to be able to determine through the interview process. So they stopped the interviews and simply accepted everyone's... The interviews were offered in response to the request for not taking the vaccine. That is correct. It wasn't a general program for employees. It was only for the people who had asked for their religious... Only for the people who had asked for the religious exemption. And the only reason Mr. Beale was interviewed and Miss was not, was he happened to be higher on the list when they were going through that first 24. And the certification that your friend on the other side mentioned, was that signed by all of the people who were applying for the religious exemption? I do not believe it was. They were asked to sign it. I don't believe everyone signed it and no one was terminated. What was it signed by Mr. Beale, you? I believe so. You know whether it was signed by Mrs. Beale, you? It was not. Okay. Because it was, again, part of the interview process, I believe. And so, with regard to Mrs. Beale, you, I'm not going to spend a lot of time with her. It's our position that her concern about things that might happen in the future and her testimony that it's an uncertain future is just not a cognizable claim. We do not believe that she never missed a day of work. She continues to be employed as does Mr. Beale, you. And she does not have any claim of harm that she can bring before the court. You know, we're in this sort of like gray area, you know, in terms, we've got a some harm standard now where that's been clarified, I guess. And we have to determine whether these various things satisfy it. I mean, so I get your argument. Do you have any case law that kind of supports what you just said that these concerns, particularly about these future potential harms, are cognizable as, you know, they meet this some harm requirement? Yes, Your Honor. Or is this just developing or, you know? On page 22 of our brief, we cite several cases that stand for the proposition that speculative harm is not cognizable. And then with regard to Muldrow . . .  No, not exactly in this context. That's kind of, I was just, that's, I guess, what my question is getting at, just if you happen to know or . . . Quite frankly, Your Honor, I'm not aware of any case where someone has brought a lawsuit to complain about something that never happened. What do you think we need to do in light of the Muldrow cases? So the Muldrow case, you have to read that in connection with EEOC versus Abercrombie and Fitch. And while I understand Muldrow changed the standard that Judge Ashley used, and there's no question about that, the Abercrombie and Fitch case finds that where an employer is willing to accommodate a religious need, there is no adverse action. It takes the adverse action issue out. Right. But, you know, if the accommodation itself still leaves some adverse effects, then there could be an adverse action. I mean, you could have an . . . I mean, for example, I mean, it seems like the basis of their suit is the, it's the differences between the one type of accommodation and the other. And respectfully, I disagree with that view, that I do not believe that it allows the finding of adverse action. And here . . . I mean, because there wasn't any harm, really, in the differences here, or legally, if the employer does anything that looks like an accommodation, then they're insulated from liability? Well, clearly, there's a line. I don't think you can say anything that looks like an accommodation. But if they do something . . . and in our view, the, you know, Bill Yu's brief keeps referring to the indefinite leave, the indefinite leave, the indefinite leave. That was not the discussion. Even Mr. Bill Yu, in his testimony at the injunction hearing, acknowledged that it was to be re-evaluated in 60 days, and that . . . within 60 days, and that the re-evaluation would focus on the spread factor at that time. I mean, it was not some ambiguous, this will never change. It was . . . Playing it by ear, kind of, you know, more or less? Well, it's not playing it by ear. It's looking at the science as to what the spread factor was, as it goes forward. But . . . Well, he had to take some of this back . . . Yes, sir. . . . back vacation time, or whatever it was that was backed up. That's not a factor in this case. Didn't he take some . . . He did. He used almost a month's worth of vacation. Why isn't that a concrete harm? I mean, that seems pretty concrete. Because that's something he chose to do. As opposed to not get paid? As opposed to not get paid. And I understand that's not a great choice. Yeah. Meanwhile, if you get the medical leave, you do get paid, right? Yes. If you got the medical leave, you continued working, and because you continued working, you got paid. So I take it this leave was taking place when U.T. Battelle had determined that these were sincerely held religious beliefs. That is correct. And so, again . . . You should just have to take your vacation days to accommodate your sincerely held religious beliefs. Again, you didn't have to take your vacation days. I understand it's a Hobson's choice. So you'd be fired, right? No. You would not be fired. I mean, that's the difference in this case and a lot of the vaccine cases. What would have happened if Mr. Biliot had showed up, instead of taking the leave at his employer, would they have escorted him off the property? They would have. But they would not have . . . They wouldn't have fired him because of that? No. If he continued to receive his benefits, the benefits continued for 60 days, which was part of the tie of we're going to re-evaluate within 60 days. He never lost his security clearance, which is a big . . . What if he had said, I don't want to take my vacation, I want to be paid for my job? That was not one of the options that was available. And that's not adverse? In this situation, I don't believe it is, no, sir. Why don't you believe that? I think this is a pretty important part of the appeal here. Why isn't that adverse? He wants to work. His wife gets . . . I mean, his wife is the comparator. She's allowed to work. If they're both named Biliot, I think they're pretty similarly situated. She's allowed to work, and she gets paid. He wants to work, he can't work, and he doesn't get paid unless he burns up all his vacation, which is a harm. Many of us would feel that way. I am not blind to how I would feel myself if I was told you need to stay home for a month and you're either not going to be paid or you have to take your vacation. I understand that's a quandary, but I also understand that that was for the religious accommodation. That was the accommodation. Right. But the question is whether that regime violates Title VII. Why doesn't that disparity amount to discrimination? Because unpaid leave has been found to be a reasonable accommodation. But it's not about what's a reasonable accommodation in the sense of somebody has an impairment or whatever and you're trying to work with them to have them participate in the workplace. This is a comparison with how similarly situated non-religious actors are treated, or them and the religious actors. Are the religious actors treated less favorably, basically? I mean, I'm kind of struggling to see why he's not treated worse than she was. Okay. First of all, this is not an ADA case, so it's not a matter of- No, I know that. I know that. It's a Title VII case. There is a different standard. There is a different approach. But with regard to the medical, there were 44 individuals who were granted medical. A number of those individuals, and I don't know the exact number, actually had just had COVID. So the reason they couldn't have a vaccine was because they had just finished having COVID. They were all temporary except for one, short-term issues. And the decision was made, okay, we can handle these 25, 24 short-term issues, and then the individuals can have the choice of getting vaccinated afterward. With regard to the religious, a person's religion presumably is not going to change, or their religious views and their religious beliefs. And so those were of a more permanent nature. And so, you know, did they know if they'll get them back within 60 days? They didn't. A change in the law actually pushed the 30 days of getting them back. But at the end of the day, as you look back, it was a 30-day period. And based on that 30-day period, he didn't have to get a vaccination. He didn't lose his job. He continues to be employed there today. And... He lost those days. Those days are worth a lot of money, right? Those days do have a value, yes. You know, did you all try an equitable result in this case and say, we made a mistake and you get these days back? But, well, there have been discussions on settlement that I can't bring up here, so I'll pass on those. But when you look at the time period, again, it's not an adverse issue for the person to be given an accommodation that allows them to respect their religious needs. I think, I mean, I think you're kind of blending two factors in the test. I mean, one is whether the person is treated differently, the religious actor is treated differently than similarly situated employees. I think your point about the permanency of one's faith compared to transient medical condition, you know, you could make that argument as to similarly situated. But adverse action just stands on an island. You know, was something done here that counts as an adverse action? Doesn't mean the case is over. You still have to show there's discrimination, but, I mean, I don't know. I just have a hard time seeing how burning up a month's vacation is not some harm. Again, I go back to the Abercrombie case, Your Honor. Okay. All right. Well, no, that's fair. I appreciate that. Okay. Well, you've got time, so if there's . . . Okay. Well, I mean, there's also the Title VII, the failure to accommodate case. Again, our position is he was accommodated. There was no discharge or discipline that's connected to the case. And then, again, with regard to retaliation, it's our position you can't use the accommodation as the basis for the retaliation. Is there any authority for that proposition? Yes, sir. I don't mean to quiz you on what you've already told us in your brief. I would have to. That's all right. It's in the brief, Your Honor. Yeah. What was the purpose of the fact sheet again? I just want to make sure. Was that not retaliatory for the fact that the people were asking for an accommodation, that they had to read this fact sheet and then sign a statement? I don't believe it's retaliatory if they had the whole process to do over again. Well, if they hadn't have asked for the accommodation, they wouldn't have been given the fact sheet and had to read it. That is correct. And the purpose or the intended purpose of the fact sheet was to try to educate people on what is and is not made from cells. So do you think it would have been okay for Battelle to bring in religious leaders to conduct a seminar for all those who were asking for an accommodation to be instructed on what the religious faith should be for when it comes to vaccines? I do not think it would be okay to have someone come in to tell them what their religious belief should be. I do believe it would be okay to have someone come in to provide some educational material. And you don't think what the statements from the religious leaders in the fact sheet were not intended to tell the people that were applying for the exemption what their faith should be? No, sir. I think it was intended to give a different perspective of what their faith could be. And was it intended to give a different perspective as to what the moral implications of stem cell research was? That's a hard question for me to ask. It sounds like it's kind of one-sided, I think. Oh, it's absolutely one-sided. That's a straight answer. Yeah. I'm not going to. So thank you very much. All right. Thank you, sir. We appreciate your argument. We'll hear a rebuttal. What about Mr. Fraser's point about, again, the permanency of one's faith compared to the transient character of some medical conditions, and why, in your view, are the two individuals still similarly situated, not understanding that difference? Yeah. I think that's a critical distinction, particularly when it goes to the questions we were talking about earlier about harm. We've heard a lot about how this was just going to be a— You need to start the clock. Thank you. You know, we've heard a lot about how— We don't have any extra time here. Go ahead. I'll speak faster.  You know, we heard a lot about the temporariness of the accommodation. It was short-lived, it's only a month off. If that were the case, we wouldn't be hearing anything about a temporary medical accommodation versus a permanent religious accommodation. The fact that that was the distinction that was made underscores that UT Battelle intended to put people out of work for an extended period of time. Now— It seems like they just, you know, it was indefinite. They didn't know how things were going to progress with the sort of, you know, delta situation. It's not that they knew it was going to be a long time. I mean, I don't really see a lot of evidence of that, but that it was, you know, anything was possible, I guess. Well, I would point out that, again, the lab director said that leave could last up until the end of the pandemic. John Powell testified that when we granted the exemption request for religious accommodations, we didn't know what the future held. In 60 days, we would just reevaluate. Mr. Powell said at the PI hearing, I don't know what things will look like in 60 days. And importantly, there was a permanent medical accommodation granted. There were also medical accommodations granted that were for multiple years. So it's not that all medical accommodations were short. Let's get back to, like, why are they similarly— Sure. So I think the— —similarly situated. Yeah, the similarly situated analysis in this case is different than what often comes up. And that's because we often look for same supervisors, same job duties, that type of thing. But in this case, UT Battelle didn't consider supervisors, didn't consider job duties. This doesn't seem germane. I mean, like, why doesn't the distinction that Mr. Fraser emphasized, why doesn't that affect similarly situated? I think the similarly situated analysis would be you have one employee told you have to do your job in the office. Another employee, you have to do your job in the office. One of them, under the same circumstances, is allowed to keep working in the office. One is not. That is—and you have the same decision-maker. Jody Zahn was the decider for both camps. She was the only person who decided whether or not to grant an accommodation. You have Mrs. Bilyeu, who was told at the PI hearing, we heard, you cannot work in the  It's not safe for you to work in the office. And the only thing that changed is the submission of a medical accommodation request. And Stephanie Bruffy, a former plaintiff in this case, similar situation, was told, you cannot work in the office. It's not safe for you to work in the office. She's a breastfeeding mother, submits a medical accommodation request, suddenly can work in the office. I do want to hit on just a few other points very briefly. The interviews occurred during the week of September 15, page ID 1989. Jeff Bilyeu did sign the certification. You see that in his deposition at page 42, lines 21 through 22, page ID 1867. There's more in this case than just the certification statements and the fact sheets. There's a question-and-answer document that went out to everyone at page ID 2050, had a question at number 35, stating that you, Petit Patel, can backfill your position. That question 41, saying there's no guarantee your job will even be there for you when you return. And, in fact, we see at page ID 1913 that Mrs. Bilyeu's job was posted online. And it's a discussion at pages 106 to 108 of the Valentino-Jefferson deposition that I would refer the court to, where Mr. Jefferson talks about that. Abercrombie, just like Hart and Hovarth and some other cases plaintiffs, I'm sorry, UT Patel cited, do, in fact, turn on the reasonableness of accommodation. A reasonable accommodation might end the inquiry, but it turns on reasonableness. Very well. Okay. We thank you both for your arguments. The case will be submitted.